**MOTORCITY OF JACKSONVILLE, LTD.,** a limited partnership, By and Through its general partner **MOTORCITY OF JACKSONVILLE, INC.,** a Florida corporation, David S. Hess, Plaintiffs–Appellants,

v.

**SOUTHEAST BANK N.A.,** David Feigenbaum, Defendants,

**Federal Deposit Insurance Corporation,** as receiver for Southeast Bank, N.A., Defendant–Appellee.

No. 93–4634.

United States Court of Appeals, Eleventh Circuit.

May 8, 1996.

Dyanne E. Feinberg, Miami, FL, for appellants.

Kipp A. Coddington, Christopher D. Cerf, Daniel E. Troy, Stephen Goldman, Washington, DC, for Motorcity & David Hess.

Julie Feigeles, Miami, FL, S. Alyssa Roberts, James Scott Watson, Washington, DC, for appellees.

Before TJOFLAT, Chief Judge, and KRAVITCH, HATCHETT, ANDERSON, EDMONDSON, COX, BIRCH, DUBINA, BLACK, CARNES and BARKETT, Circuit Judges.

ANDERSON, Circuit Judge:

## I. INTRODUCTION

In this decision, we consider whether the district court correctly granted a motion to dismiss in favor of appellee Federal Deposit Insurance Corporation ("FDIC") based upon the *D'Oench* doctrine. *See D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). For the reasons that follow, we affirm the judgment of the district court.

## II. FACTS

This case arises from the banking relationship of appellants Motorcity of Jacksonville, Ltd., Motorcity of Jacksonville, Inc., and

David S. Hess (collectively "Motorcity") [1] with the financial institution of Southeast Bank, N.A. ("Southeast"). We assume the following allegations from Motorcity's pleadings to be true for purposes of resolving the FDIC's motion to dismiss. In 1986, Motorcity and Southeast negotiated a floor plan financing agreement, under which Southeast agreed to lend Motorcity funds to purchase inventory for its used car dealership. During the negotiations, Motorcity orally informed Southeast that appellant David Hess and other Motorcity investors lacked experience in running a car dealership and planned to operate the dealership as absentee owners. Southeast orally assured Motorcity that its personnel were experienced with floor plan financing and that "the bank 'knew what it was doing.'" R2–58 Ex. 1 ¶ 14. Of particular concern to both Southeast and Motorcity were "out-of-trust" sales, which occur whenever a dealership fails to use the proceeds from the sale of a vehicle to repay the loan designated for that vehicle. Continued unchecked, such out-of-trust sales could pose a threat to a dealership's financial viability.

Motorcity and Southeast executed a written floor plan financing agreement in June 1987. Pursuant to the floor plan financing agreement, Southeast retained the right to audit Motorcity's records.[2] Southeast hired an independent contractor to audit Motorcity on a monthly basis. Through these audits, Southeast allegedly discovered a pattern of out-of-trust sales at the dealership: rather than repaying the floor plan loans, Motorcity's managers were using the sales proceeds from vehicles to pay themselves unearned bonuses. Although Southeast or its auditor sent summary audit reports to Motorcity, the bank failed to disclose these out-of-trust sales to Motorcity.

In February 1989, Motorcity learned from its newly-hired general manager that the dealership was out-of-trust more than $400,-000. Motorcity immediately notified Southeast of the situation. Southeast demanded immediate payment for the entire out-of-trust amount, but Motorcity was unable to meet the bank's demand. Southeast took possession of Motorcity's collateral, including the dealership itself and $375,000 in certificates of deposit. Motorcity repaid all of its loans to Southeast by April 1990.

## III. PROCEEDINGS BELOW

Motorcity sued Southeast and one of its employees in Florida state court, alleging breach of fiduciary duty, breach of oral contract, and negligence. Less than a year later, in September 1991, the Office of the Comptroller of the Currency declared Southeast insolvent and appointed the FDIC as receiver for the failed bank. The FDIC was substituted for Southeast as defendant in the state court action, and the FDIC removed the case to federal court.

Motorcity amended its complaint to state a claim only for breach of written contract. The district court dismissed this amended complaint for failure to state a claim upon which relief could be granted. The court found that the floor plan financing agreement gave Southeast the right, but not the duty, to audit Motorcity; thus Southeast was under no contractual obligation to inform Motorcity of the out-of-trust sales. The court further ruled that the *D'Oench* doctrine and 12 U.S.C. § 1823(e)(1) required any agreement between a failed financial institution and its customer to be in writing; consequently, any claims for breach of oral contract were barred. Finally, the court held that the *D'Oench* doctrine also foreclosed Motorcity's putative tort claims. The court reasoned

---

**1.** Motorcity of Jacksonville, Ltd., was a limited partnership engaged in the business of selling used vehicles in Duval County, Florida. Motorcity of Jacksonville, Inc., a Florida corporation, was the limited partnership's general partner. David S. Hess, a Jacksonville cardiologist, was the president and a principal shareholder of Motorcity of Jacksonville, Inc.

**2.** In the written agreement, Motorcity made the following affirmative covenant to Southeast:

> [Motorcity] will keep and maintain full and accurate accounts and records of its operations ... and will permit [Southeast] and its designated officers, employees, agents and representatives, to have access thereto and to make examination thereof at all reasonable times, to make audits, and to inspect and otherwise check its properties, real, personal and mixed. R1–35 Ex. B ¶ 5.7.

that "[t]he genesis of this action is the Southeast floor plan financing agreement, whose written provisions do not support a breach of contract claim against the FDIC. No amount of artful pleading, including further amendments to the complaint, can alter this result." R2–52–8.

Motorcity moved for a rehearing and for leave to amend its complaint to add tort claims for negligence and for breach of fiduciary duty to notify. The district court denied both motions. In its omnibus order, the court reiterated that the *D'Oench* doctrine barred all oral contract claims, including those claims recast as tort actions by " 'artful pleading.' " R2–67–1–2.

■ On appeal, a panel of this court held that Motorcity's state law tort claims for negligence and for breach of fiduciary duty were free standing torts, not barred by the *D'Oench* doctrine. *Motorcity of Jacksonville, Ltd. v. Southeast Bank, N.A.*, 39 F.3d 292 (11th Cir.1994). The FDIC's petition for en banc hearing was granted, thus vacating the panel opinion. 58 F.3d 589 (11th Cir. 1995).[3]

## IV. STANDARD OF REVIEW [4]

■ Motorcity appeals solely the district court's denial of its motion to file a second amended complaint to add its proposed tort claims. Our review standard for a district court's denial of a motion to amend a complaint is abuse of discretion. *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S.Ct. 795, 802, 28 L.Ed.2d 77 (1971); *Shipner v. Eastern Air Lines, Inc.*, 868 F.2d 401, 407 (11th Cir.1989). After a responsive pleading has been filed, subsequent amendments are permissible only with leave of court, which "shall be freely given when justice so requires." Fed.R.Civ.P.

15(a). This liberal policy of allowing amendments under Rule 15(a) "circumscribes the exercise of the district court's discretion; thus, unless a substantial reason exists to deny leave to amend, the discretion of the district court is not broad enough to permit denial." *Shipner*, 868 F.2d at 407; *see also Moore v. Baker*, 989 F.2d 1129, 1131 (11th Cir.1993) (holding that "a justifying reason *must be apparent* for denial of a motion to amend") (emphasis added).

■ In this case, the district court denied Motorcity's motion to amend based on the court's legal determination that Motorcity's proposed tort claims were barred by the *D'Oench* doctrine. The futility of a proposed amended complaint can be a justifiable reason for denying leave to amend. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *Moore*, 989 F.2d at 1131. When a district court denies leave to amend a complaint because of futility, we review *de novo*. *Keweenaw Bay Indian Community v. State*, 11 F.3d 1341, 1348 (6th Cir.1993); *see also In re Geri Zahn, Inc.*, 25 F.3d 1539, 1542 (11th Cir.1994) (explaining that the applicability of the *D'Oench* doctrine is a question of law, subject to *de novo* review); *Freer v. Dugger*, 935 F.2d 213, 216 (11th Cir.1991) ("Regarding the standard of review, conclusions of law by the district court are not binding on appellate courts and this court is free to substitute its judgment for the district court's on matters of law.") Accordingly, we review *de novo* the district court's determination that Motorcity's tort claims are barred by the *D'Oench* doctrine and its statutory counterpart, 12 U.S.C. § 1823(e)(1).

## V. DISCUSSION

Our analysis begins with an examination of the *D'Oench* doctrine's origins and with the

---

3. Part IIA of the panel opinion was not reconsidered by the en banc court and is REINSTATED, with the exception of the last sentence.

It is clear that the district court had jurisdiction for several reasons including the "deemer" clause, 12 U.S.C. § 1819(b)(2)(A), and the removal clause, *id.* § 1819(b)(2)(B), pursuant to which the district court properly allowed the FDIC to remove the case to federal court. The exception to federal jurisdiction provided by 12 U.S.C. § 1819(b)(2)(D) does not apply because South-

east was a national bank, not a state chartered institution, because a federal authority, not a state authority, appointed the FDIC as receiver of Southeast, and because the interpretation of federal law (i.e., the *D'Oench* doctrine and its statutory counterparts) is necessary to decide this case.

4. This Part substantially adopts the panel opinion's statement of the standard of review.

leading case itself, *D'Oench, Duhme & Co., Inc. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In that case, the Supreme Court created a federal common law doctrine of estoppel to protect the FDIC from defenses raised by debtors based on "secret agreements" with failed banks. *D'Oench* involved a securities dealer who sold a bank some bonds which later became worthless. To prevent the past due bonds from appearing among the assets of the bank, the dealer executed a demand note with the bank and entered into a separate agreement with the bank that the note would not be called for payment. The FDIC later acquired the note in a purchase and assumption transaction. When the FDIC demanded payment on the note, the maker defended on the basis of the side agreement with the bank, in which the bank promised not to call the note for payment. *Id.* at 454, 62 S.Ct. at 678. The lower courts applied Illinois state law and held that the FDIC was entitled to recover on the note as a "holder in due course." *Id.* at 455, 62 S.Ct. at 678.

The Supreme Court rejected the lower courts' use of state law and instead created a federal common law rule by drawing an analogy to provisions of the Federal Reserve Act, which "reveal[ed] a federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures or to which it makes loans." *Id.* at 457, 62 S.Ct. at 679. The Court held that a "secret agreement" outside the documents contained in the bank's records would not operate as a defense against a suit by the FDIC on the note. *Id.* at 459, 62 S.Ct. at 680. Significantly, the Court added that the maker of the note did not have to intend to deceive anyone; it was sufficient "that the maker lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled." *Id.* at 460, 62 S.Ct. at 681.

██ Eight years later, Congress partially codified the holding in *D'Oench* as section 2(13)(e) of the Federal Deposit Insurance Act of 1950, 64 Stat. 873, 889, as amended, 12 U.S.C. § 1823(e)(1), which provided:

No agreement which tends to diminish or defeat the right, title or interest of the Corporation [FDIC] in any asset acquired by it under this section, either as security for a loan or by purchase, shall be valid against the Corporation unless such agreement (1) shall be in writing, (2) shall have been executed by the bank and the person or persons claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the bank, (3) shall have been approved by the board of directors of the bank or its loan committee, which approval shall be reflected in the minutes of said board or committee, and (4) shall have been, continuously, from the time of its execution, an official record of the bank.[5]

Thus, "[t]he statute makes the common law principle both more encompassing and more precise." *FDIC v. O'Neil,* 809 F.2d 350, 353 (7th Cir.1987). By allowing the FDIC to rely on the records of the bank, the specific recording requirements of § 1823(e) enable the FDIC to determine quickly whether to engage in a purchase and assumption transaction, or whether to liquidate the failed bank and pay off insured deposits.[6] The Supreme Court explained:

---

**5.** As originally enacted in 1950, § 1823(e) also included a paragraph that authorized the FDIC to engage in purchase and assumption transactions. This paragraph was moved to 12 U.S.C. § 1823(c) by the Garn–St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982).

**6.** When a bank fails, the FDIC acts simultaneously in two capacities: the receiver capacity ("FDIC–Receiver") and the corporate capacity ("FDIC–Corporate"). The corporate capacity of the FDIC refers to its role as the insurer of bank deposits. Rather than liquidating a bank when it fails, the FDIC whenever feasible employs a purchase and assumption transaction. In a purchase and assumption transaction, the FDIC–Receiver sells the failed bank as a going concern to a financially sound bank, in return for the purchasing bank's promise to assume all the failed bank's deposit liabilities. Unacceptable assets remain with the FDIC–Receiver. FDIC–Corporate then purchases the unacceptable assets with insurance funds, and attempts to collect on the unacceptable assets to minimize the FDIC's losses. *See generally Gunter v. Hutcheson,* 674 F.2d 862, 865–66 (11th Cir.) (explaining the mechanics of a purchase and assumption transaction), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).

[This] evaluation, in particular, must be made "with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

*Langley v. FDIC,* 484 U.S. 86, 91–92, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987) (quoting *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982) (citations omitted)). In addition to requiring an alleged agreement to appear in the bank's records, § 1823(e) requires the agreement to "have been executed 'contemporaneously' with the making of the note and to have been approved by officially recorded action of the bank's board or loan committee." *Id.* at 92, 108 S.Ct. at 401. The Court explained:

> These ... requirements ensure mature consideration of unusual loan transactions by senior bank officials, and prevent fraudulent insertion of new terms, with the collusion of bank employees, when a bank appears headed for failure.

*Id.* However, it is "clear that the *D'Oench* doctrine applies even where the customer is completely innocent of any bad faith, recklessness, or negligence." *Baumann v. Savers Fed. Sav. & Loan Ass'n,* 934 F.2d 1506, 1515 (11th Cir.1991), *cert. denied,* 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992). Thus, § 1823(e) and the *D'Oench* doctrine encourage "banks and their customers [to] include the entire extent of their obligations in the bank's records." *Id.; see also Bell & Murphy & Assoc. v. Interfirst Bank Gateway, N.A.,* 894 F.2d 750, 754 (5th Cir.) ("The *D'Oench, Duhme* doctrine ... favors the interests of depositors and creditors of a failed bank, who cannot protect themselves from secret agreements, over the interests of borrowers, who can."), *cert. denied,* 498 U.S. 895, 111 S.Ct. 244, 112 L.Ed.2d 203 (1990); *In re NBW Commercial Paper Litigation,* 826 F.Supp. 1448, 1461–62 (D.D.C.1992) (describing *D'Oench* and § 1823(e) as "a regime that places the risk on borrowers if they do not get all of the terms of their agreements in writing").

As originally enacted in 1950, § 1823(e)(1) paralleled the facts of the *D'Oench* case itself: it applied only to the FDIC in its corporate capacity when it purchased bank assets from its receivership division. *Vernon v. RTC,* 907 F.2d 1101, 1105 (11th Cir.1990). However, the federal policy expressed in the *D'Oench* decision "applies in virtually all cases where a federal depository institution regulatory agency is confronted with an agreement not documented in the institution's records." *OPS Shopping Ctr., Inc. v. FDIC,* 992 F.2d 306, 308 (11th Cir. 1993) (quoting *Baumann,* 934 F.2d at 1510). Courts therefore applied the federal common law *D'Oench* doctrine to protect certain entities not covered by the language of § 1823(e)(1)—including, for example, the FDIC as receiver, the Federal Savings and Loan Insurance Corporation ("FSLIC"), and transferees of assets (such as bridge banks) from banking regulatory agencies. *See, e.g., FSLIC v. Two Rivers Assocs., Inc.,* 880 F.2d 1267, 1274, 1276–77 (11th Cir.1989) (holding that the federal common law *D'Oench* doctrine protects the FSLIC and the FDIC in both receiver and corporate capacities); *Newton v. Uniwest Fin. Corp.,* 967 F.2d 340, 347 (9th Cir.1992) (extending the *D'Oench* doctrine to a private bank, as the FSLIC's successor-in-interest in a note); *Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 49 (1st Cir.1991) (per curiam) (citing cases for the proposition that "courts have consistently applied the [*D'Oench*] doctrine to those situations where the FDIC was acting in its capacity as receiver"); *Kilpatrick v. Riddle,* 907 F.2d 1523, 1528 (5th Cir.1990) (extending the *D'Oench* doctrine to the FDIC's assignee, a bridge bank), *cert. denied sub nom. Rogers v. FDIC,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991); *Porras v. Petroplex Sav. Ass'n,* 903 F.2d 379, 381 (5th Cir.1990) (extending the *D'Oench* doctrine's protection to transferees of assets from the FSLIC in purchase and assumption transactions); *FDIC v. First Nat'l Fin. Co.,* 587 F.2d 1009, 1012 (9th Cir.1978) (rejecting the argument that the *D'Oench* doctrine does not apply to the FDIC as receiver). Courts also applied the *D'Oench* bar to secret agree-

ments between borrowers and a subsidiary of the failed financial institution under the regulatory agency's control. *See Victor Hotel Corp. v. FCA Mortg. Corp.*, 928 F.2d 1077, 1083 (11th Cir.1991); *Robinowitz v. Gibraltar Sav.*, 23 F.3d 951, 956 (5th Cir.1994) (holding that *D'Oench* applies to secret side agreements made by subsidiaries and sub-subsidiaries of the failed institution in receivership), *cert. denied,* — U.S. —, 115 S.Ct. 725, 130 L.Ed.2d 630 (1995); *Sweeney v. RTC*, 16 F.3d 1, 4 (1st Cir.) (per curiam) (holding that the *D'Oench* doctrine extends to claims involving a wholly owned subsidiary of the failed financial institution in receivership), *cert. denied,* — U.S. —, 115 S.Ct. 291, 130 L.Ed.2d 206 (1994); *Oliver v. RTC*, 955 F.2d 583, 585–86 (8th Cir.1992) (holding that the *"D'Oench* doctrine extends broadly to cover any secret agreement adversely affecting the value of a financial interest that has come within the RTC's control as receiver of a failed financial institution" including the financial interest of a wholly-owned subsidiary). Furthermore, as originally enacted, § 1823(e)(1) generally applied only to preclude defenses raised by borrowers to avoid repaying their loans. *Thigpen v. Sparks*, 983 F.2d 644, 647–48 (5th Cir.1993). Courts applied the federal common law *D'Oench* doctrine to bar the assertion of affirmative claims against the FDIC, including claims sounding in tort. *See RTC v. Dunmar Corp.*, 43 F.3d 587, 595 (11th Cir.) (en banc) (holding that *"D'Oench* bars defenses and affirmative claims whether cloaked in terms of contract or tort, as long as those claims arise out of an alleged secret agreement" (quoting *Timberland*, 932 F.2d at 50)), *cert. denied sub nom. Jones v. RTC,* — U.S. —, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *Beighley v. FDIC*, 676 F.Supp. 130, 132 (N.D.Tex.1987)

("To allow a claim *against* the FDIC asserting the very grounds that could not be used as a defense to a claim *by* the FDIC is to let technicality stand in the way of principle."), *on reh'g,* 679 F.Supp. 625 (N.D.Tex.1988), *aff'd,* 868 F.2d 776 (5th Cir.1989). In *Dunmar*, we reiterated this circuit's *D'Oench* rule, which reflects the judicial extensions of the doctrine over the years:

> In a suit over the enforcement of an agreement originally executed between an insured depository institution and a private party, a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.

*Id.* at 593 (quoting *OPS*, 992 F.2d at 308 and *Baumann*, 934 F.2d at 1515).[7]

In the wake a mounting crisis in the banking and thrift industry, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183, *inter alia,* "to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." *FDIC v. Wright*, 942 F.2d 1089, 1095–96 (7th Cir.1991) (quoting H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 330, *reprinted in* 1989 U.S.Code Cong. & Admin.News 126), *cert. denied,* 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992). FIRREA substantially codified several of the significant common law developments in the *D'Oench* doctrine, expanding the applicability of § 1823(e) to the FDIC in its receivership capacity,[8] to the newly-created Resolution Trust Corporation (RTC) in either its corpo-

---

7. Courts that expanded the *D'Oench* doctrine often applied the common law and § 1823(e)(1) in tandem, reasoning that "the purposes of *D'Oench* and section 1823(e) were the same, and therefore ... the same analysis [applied] regardless of whether the party involved in the case was the FDIC or another federal banking regulator." *Baumann*, 934 F.2d at 1515. Cases interpreting either common law *D'Oench* or § 1823(e)(1) were both considered precedent. *Id.* In the only Supreme Court decision directly addressing § 1823(e), the Court unanimously agreed that the

statute should be interpreted broadly, so as not "to disserve the principle of [*D'Oench*]." *Langley v. FDIC*, 484 U.S. 86, 92–93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987).

8. Section 217(4) of FIRREA expanded the applicability of § 1823(e) to the FDIC in its receiver capacity by adding the words "or as receiver of any insured depository institution." 1989 U.S.Code Cong. & Admin.News (103 Stat.) 183, 256.

rate or receivership capacity,[9] and to bridge banks.[10] FIRREA also added 12 U.S.C. § 1821(d)(9)(A), which explicitly extends the protection of § 1823(e) to affirmative claims against the banking authority. It provides that "any agreement which does not meet the requirements set forth in § 1823(e) ... shall not form the basis of, or substantially comprise, a claim against the receiver or the Corporation." The substance of § 1823(e)— i.e., the range of secret agreements prohibited by the statute—was left untouched.[11]

Motorcity makes several arguments in its effort to prevent the application of the D'Oench doctrine to its claims against the FDIC. First, Motorcity argues that the federal common law D'Oench doctrine has been preempted by statute and that therefore the FDIC must rely exclusively on §§ 1821(d)(9)(A) and 1823(e)(1), the statutory cousins of the D'Oench doctrine. Second, Motorcity argues that §§ 1821(d)(9)(A) and 1823(e)(1) bar only those claims that impair the FDIC's interest in a specific bank asset. Because Motorcity paid off its loan to Southeast before the FDIC's appointment as receiver, Motorcity argues that these statutory provisions do not apply to its claims. Third, Motorcity argues that its claims against the FDIC are "free standing tort claims," which are not barred by the D'Oench doctrine. Finally, even if the D'Oench doctrine prevents any reliance on oral agreements or representations, Motorcity suggests that its state law tort claims are still viable. We address each of Motorcity's arguments in turn.

### A. Has the Federal Common Law D'Oench Doctrine Been Preempted by Statute?

We first address Motorcity's argument that the federal common law D'Oench doctrine has been preempted by statute. In Murphy v. FDIC, 61 F.3d 34 (D.C.Cir.1995), the D.C. Circuit recently held that the Supreme Court's reasoning in O'Melveny &

Myers v. FDIC, —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), leads "ineluctably" to the conclusion that the common law D'Oench doctrine has been preempted. Id. at 38; see also DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City, 69 F.3d 1398, 1402 (8th Cir.1995) (following Murphy's reasoning and holding that the federal holder in due course and D'Oench doctrines have been preempted). We disagree with the analysis of the D.C. and the Eighth Circuits and hold that the federal common law D'Oench doctrine has not been preempted by statute.

Our analysis of the preemption issue begins with a discussion of the effect of federal statutes on the federal common law, in light of the role that the federal common law plays in our system. In Swift v. Tyson, 41 U.S. (16 Pet.) 1, 18–19, 10 L.Ed. 865 (1842), the Supreme Court held that, in the absence of a state statutory or constitutional provision, federal courts sitting in diversity should not apply a state court's common law decisions. Rather, federal courts should fashion their own federal common law rules by consulting "the general principles and doctrines of ... jurisprudence." Id. at 19. Almost a century later, in Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78–80, 58 S.Ct. 817, 822–23, 82 L.Ed. 1188 (1938), the Supreme Court expressly overruled Swift, holding unconstitutional the federal common law regime created by that decision. Writing for the Court, Justice Brandeis flatly declared: "There is no federal general common law." The Court explained that the Swift doctrine represented an unconstitutional invasion by the federal courts into the powers "reserved by the Constitution to the several states." Id. at 79–80, 58 S.Ct. at 823.

However, the holding in Erie did not destroy all types of federal common law. Since Erie, the Supreme Court "has recognized the need and authority in some limited areas to formulate what has come to be

9. 12 U.S.C. § 1441a(b)(4)(A) (Supp. V 1993) (superseded) granted the RTC powers similar to those enjoyed by the FDIC, including the power to invoke § 1823(e).

10. 12 U.S.C. § 1821(n)(4)(I) protects bridge banks with language borrowed from § 1823(e).

11. FIRREA made minor amendments to § 1823(e) by deleting the words "right, title and" from before the word "interest" and by changing the verbs in the subparagraphs to the present tense.

known as 'federal common law.'" *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981). In particular, federal courts have created and applied federal common law when necessary to protect certain "uniquely federal interests." *Boyle v. United Technologies Corp.*, 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988) (holding that federal common law governs the tort liability of a helicopter manufacturer to a deceased pilot, where the manufacturer supplies the helicopters to the federal government); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 726–27, 99 S.Ct. 1448, 1457, 59 L.Ed.2d 711 (1979) (holding that the priority of liens stemming from federal lending programs is a matter of federal common law); *Howard v. Lyons*, 360 U.S. 593, 597, 79 S.Ct. 1331, 1333–34, 3 L.Ed.2d 1454 (1959) (creating a federal common-law privilege that protects federal officers from libel and defamation suits arising out of statements made in the course of duty); *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943) (holding that the rights and duties of the United States on commercial paper which it issues are governed by federal law and that "[i]n the absence of an applicable Act of Congress it is for the federal courts to fash-

ion the governing rule of law according to their own standards.").[12]

Courts often examine the policies expressed by Congress in statutes in order to identify those "uniquely federal interests" that make necessary the development of federal common law. *See, e.g., Kimbell Foods*, 440 U.S. at 727, 99 S.Ct. at 1458 (describing federal common law as a means to "fill the interstices of federal legislation"); *United States v. Little Lake Misere Land Co., Inc.*, 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) (refusing to apply state law to abrogate federal government contracts to acquire land for public use, in part because doing so "would deal a serious blow to the congressional scheme contemplated by the Migratory Bird Conservation Act and indeed all other federal land acquisition programs"). In these cases, the use of federal common law effectuates congressional intent and resembles the task of statutory interpretation.[13] The *D'Oench* case itself is a leading example of the Court's use of federal statutes to identify those "uniquely federal interests" that require the creation of federal common law. *See D'Oench*, 315 U.S. at 456–57, 62 S.Ct. at 679 (analyzing statutory provisions that "reveal a federal policy to protect [the FDIC] and the public funds which it administers against misrepresentations as to the securities or other assets in the portfolios of the banks which [the FDIC] insures").[14]

**12.** There are other categories of federal common law in addition to the type created to protect "uniquely federal interests." For example, federal common law operates to resolve disputes between state governments. *See, e.g., Illinois v. City of Milwaukee*, 406 U.S. 91, 103, 92 S.Ct. 1385, 1392, 31 L.Ed.2d 712 (1972) ("When we deal with air and water in their ambient or interstate aspects, there is a federal common law."); *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 110, 58 S.Ct. 803, 811, 82 L.Ed. 1202 (1938) ("[W]hether the water of an interstate stream must be apportioned between the two States is a question of 'federal common law' upon which neither the statutes nor the decisions of either state can be conclusive."). Federal common law also operates in areas "in which Congress has given the courts the power to develop substantive law." *Texas Indus.*, 451 U.S. at 640, 101 S.Ct. at 2067. *See, e.g., Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) ("[C]ourts are to develop a federal common law of rights and obligations under ERISA plans." (citation and internal quotation omitted)); *Nat'l Soc'y of Professional Engineers v.*

*United States*, 435 U.S. 679, 688, 98 S.Ct. 1355, 1363, 55 L.Ed.2d 637 (1978) (holding that Congress expected the courts to "give shape" to the Sherman Act's broad mandate "by drawing on common-law tradition").

**13.** *See* Peter Westen and Jeffrey S. Lehman, *Is There Life for* Erie *After the Death of Diversity?*, 78 Mich.L.Rev. 311, 332 (1980) ("The difference between 'common law' and 'statutory interpretation' is a difference in emphasis rather than a difference in kind. The more definite and explicit the prevailing legislative policy, the more likely a court will describe its lawmaking as statutory interpretation; the less precise and less explicit the perceived legislative policy, the more likely a court will speak of common law. The distinction, however, is entirely one of degree.").

**14.** In a famous concurring opinion in *D'Oench*, Justice Jackson justified the development of federal common law as a means to implement federal statutes. He wrote:

The federal courts have no *general* common law, as in a sense they have no general or

Because the application of federal common law is so closely tied to congressional intent, the task of determining whether a particular federal statute displaces existing federal common law requires courts to inquire carefully into the purposes of the legislation. Courts must be mindful that "the federal lawmaking power is vested in the legislative, not the judicial branch of government," *Northwest Airlines, Inc. v. Transp. Workers Union of Am.*, 451 U.S. 77, 95, 101 S.Ct. 1571, 1582, 67 L.Ed.2d 750 (1981), and that federal common law is often merely a "necessary expedient" in instances in which "Congress has not spoken to a *particular* issue." *City of Milwaukee v. Illinois*, 451 U.S. 304, 313–14, 101 S.Ct. 1784, 1790–91, 68 L.Ed.2d 114 (1981) ("*Milwaukee II*") (emphasis added). Accordingly, courts should not require from Congress "the same sort of evidence of a clear and manifest purpose" to preempt as they require in considering whether a federal statute displaces state law. *Id.* at 316–17, 101 S.Ct. at 1792.[15] At the same time, "[s]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident." *United States v. Texas*, 507 U.S. 529, 534, 113 S.Ct. 1631, 1634, 123 L.Ed.2d 245 (1993) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952)). Therefore, although "Congress need not 'affirmatively proscribe' the common law doctrine at issue," its purpose to preempt existing federal common law at a minimum must be "evident." *Texas*, 507 U.S. at 534, 113 S.Ct. at 1634–35.

In *Murphy*, without mentioning the presumption that federal common law principles survive the enactment of federal legislation, the D.C. Circuit held that FIRREA's comprehensive nature caused the federal common law *D'Oench* doctrine to disappear. 61 F.3d at 40. The court reached this startling conclusion by relying almost exclusively on certain language in the Supreme Court's decision in *O'Melveny & Myers v. FDIC*, ⸺ U.S. ⸺, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994). We disagree with *Murphy*'s reliance on *O'Melveny*.

In *O'Melveny*, the FDIC as receiver for a failed savings and loan (S & L) brought a malpractice lawsuit against the S & L's former law firm, stating causes of action under California law for professional negligence and breach of fiduciary duty. *Id.* at ⸺, 114 S.Ct. at 2052. The FDIC alleged that the law firm failed to inform the S & L of the illegal acts of the S & L's controlling officers. *Id.* The law firm defended by arguing that, under California law, knowledge of the conduct of the S & L's controlling officers must be imputed to the S & L, and hence to the FDIC, which, as receiver, stood in the S & L's shoes. The FDIC urged the Supreme Court to create a new federal common law rule to govern the imputation of knowledge to the FDIC. *See id.*

The Supreme Court began by stating that it "would [not] adopt a court-made rule to supplement federal statutory regulation that is comprehensive and detailed; matters left unaddressed in such a scheme are presumably left to the disposition provided by state law." *Id.* at ⸺, 114 S.Ct. at 2054. The Court analyzed 12 U.S.C. § 1821(d)(2)(A)(i), as amended by FIRREA, which defines the powers and duties of the FDIC as receiver

comprehensive jurisprudence of any kind, because many subjects of private law which bulk large in the traditional common law are ordinarily within the province of the states and not of the federal government. But this is not to say that wherever we have occasion to decide a federal question which cannot be answered from federal statutes alone we may not resort to all of the source materials of the common law or that when we have fashioned an answer it does not become part of the federal nonstatutory or common law.

*D'Oench*, 315 U.S. at 469, 62 S.Ct. at 685 (Jackson, J., concurring).

15. In considering whether federal legislation preempts state law, the Supreme Court assumes "that the historic police powers of the States were not to be superseded by [a] Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at 316, 101 S.Ct. at 1792 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947))).

by providing that the FDIC "shall ... by operation of law, succeed to—all rights, titles, powers, and privileges of the insured depository institution...." The Court construed § 1821(d)(2)(A)(i) as an exclusive grant of rights to the FDIC as receiver and thus held that it could not be "supplemented or modified by federal common law." *Id.* To support this conclusion, the Court listed several "provisions of FIRREA which specifically create special federal rules of decision regarding claims by, and defenses against, the FDIC as receiver." *Id.* The statute having carved out specific areas of federal interest to be subject to federal rules, the Court inferred *"[i]nclusio unius, exclusio alterius."* *Id.*

Although *O'Melveny* never mentions the *D'Oench* doctrine directly, the Court included one of *D'Oench*'s statutory cousins— § 1821(d)(9)(A)—in its list of special federal rules of decision. In *Murphy*, the D.C. Circuit concluded that the Supreme Court "necessarily decided the *D'Oench* question" by including § 1821(d)(9)(A) in this list. 61 F.3d at 39. The court in *Murphy* explained that "the inclusion of § 1821(d)(9) in the FIRREA implies the exclusion of overlapping federal common law defenses not specifically mentioned in the statute—of which the *D'Oench* doctrine is one." *Id.*

We believe that *Murphy* erred in relying on *O'Melveny*. The question presented in *O'Melveny* was whether the federal courts should *create* a *new* federal common-law doctrine in an area in which Congress had not expressed any special concern, nor indicated that a special federal rule of decision should govern.[16] In this case, the question presented is not whether a *new* rule should be invented, but whether Congress intended to abrogate the previously-established federal common-law *D'Oench* doctrine, which doctrine operates in an area of special federal concern as recognized by Congress, the Supreme Court, and the lower federal courts. The *O'Melveny* analysis does not apply to this question.

We believe that *United States v. Texas*, 507 U.S. 529, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993), rather than *O'Melveny*, provides the appropriate guidance for courts in their efforts to determine whether Congress intended that FIRREA abrogate the previously-established and longstanding federal common-law *D'Oench* doctrine. Just a year before *O'Melveny*, the Supreme Court in *Texas* addressed the question of whether Congress intended to abrogate a pre-existing and long-standing federal common-law doctrine. There, the Court held that the previously-established federal common-law doctrine was presumed to survive unless a congressional intent to the contrary was evident. The Court expressly rejected the argument that the "presumption favoring retention of existing law is appropriate only with respect to state common law." The Court explained:

> [T]here is no support in our cases for the proposition that the presumption has no application to federal common law.... "[C]ourts may take it as a given that Congress has legislated with an expectation that the [common law] principle will apply except 'when a statutory purpose to the contrary is evident.'"

*Id.* at 534, 113 S.Ct. at 1634–35 (quoting *Astoria Fed. Sav. and Loan Ass'n v. Solimino*, 501 U.S. 104, 108, 111 S.Ct. 2166, 2170, 115 L.Ed.2d 96 (1991) (quoting *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783, 72 S.Ct. 1011, 1014, 96 L.Ed. 1294 (1952))).

Motorcity attempts to overcome the presumption that the federal common law *D'Oench* doctrine survived FIRREA by arguing that Congress' "evident" purpose was

16. *See O'Melveny*, —— U.S. at ——, 114 S.Ct. at 2054 ("In answering the central question of displacement of California law, we of course would not contradict an explicit federal statutory provision. Nor would we *adopt* a court-made rule to supplement federal statutory regulation that is comprehensive and detailed.... To *create additional* 'federal common law' exceptions is not to 'supplement' this scheme, but to alter it."); *id.* at ——, 114 S.Ct. at 2055 ("[E]ven assuming the inapplicability of FIRREA this is not one of those cases in which judicial *creation* of a special federal rule would be justified.... Even less persuasive—indeed, positively probative of the dangers of respondent's facile approach to federal-common-law-*making*—is respondent's contention that [California's rule of decision] would disserve the federal program....."); *id.* at ——, 114 S.Ct. at 2056 ("We conclude that this is not one of those extraordinary cases in which the judicial *creation* of a federal rule of decision is warranted."). (All emphasis added).

to displace the *D'Oench* doctrine. Motorcity points out that FIRREA is a comprehensive piece of legislation, and contends that §§ 1821(d)(9)(A) and 1823(e)(1) displace the *D'Oench* doctrine because those statutes "speak directly" to some of the questions previously addressed by the federal common law.

 In ascertaining whether the purpose of FIRREA was to eliminate the *D'Oench* doctrine, Motorcity is correct in suggesting that we should attach significance to the comprehensiveness of the statutory scheme, and give full recognition to the fact that federal common law is subject to the paramount authority of Congress. *Milwaukee II*, 451 U.S. at 313, 101 S.Ct. at 1791. In some cases, the application of federal common law might interfere with a statutory scheme that is comprehensive in scope. *See, e.g., id.* at 317, 326, 101 S.Ct. at 1792, 1797 (describing the 1972 amendments to the Federal Water Pollution Control Act as a "comprehensive regulatory program supervised by an expert administrative agency" and explaining at length that the federal common law rule in question "would be quite inconsistent with this scheme"); *Northwest Airlines*, 451 U.S. at 97, 101 S.Ct. at 1583–84 (explaining that the enactment of a "comprehensive legislative scheme including an integrated system of procedures for enforcement" indicates that Congress' omission of a particular remedy was deliberate and declining to "fashion new remedies that might upset carefully considered legislative programs"). More precisely, federal courts are not free to contradict a congressional policy choice that "speaks directly" to a particular question previously answered by federal common law. *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625, 98 S.Ct. 2010, 2015, 56 L.Ed.2d 581 (1978) (holding that, although "Congress has never enacted a comprehensive maritime code," federal courts may not award "loss of society" damages under general maritime law because the Death on the High Seas Act expressly prohibits recovery of such damages).

 Thus, "the question whether a previously available federal common-law action has been displaced by federal statutory law involves an assessment of the scope of the legislation and whether the scheme established by Congress addresses the problem formerly governed by federal common law." *Milwaukee II*, 451 U.S. at 315 n. 8, 101 S.Ct. at 1792 n. 8. Applying this analysis, several considerations persuade us that Congress in enacting FIRREA in 1989 did not intend to preempt the federal common law *D'Oench* doctrine. In §§ 1821(d)(9)(A) and 1823(e)(1), Congress specifically carved out as an area of special federal concern the area involving the protection of the FDIC from secret or oral agreements.[17] Thus, the proper question to ask is whether Congress intended §§ 1821(d)(9)(A) and 1823(e)(1) to eliminate the entire body of federal common law known as the *D'Oench* doctrine.

As noted above, *United States v. Texas*, 507 U.S. 529, 534–36, 113 S.Ct. 1631, 1635, 123 L.Ed.2d 245 (1993) reaffirmed the principles that Congress legislates against the background of the existing common law, and that Congress has legislated with an expectation that that law will apply except when a statutory purpose to the contrary is evident. *Id.* at 534, 113 S.Ct. at 1635. In *Texas*, the long-established federal common law was that all parties, including states, who owed contractual debts to the federal government were obligated to pay prejudgment interest. The statute at issue, the Debt Collection Act of 1982, codified that obligation with respect to private debtors and made the obligation more specific and more onerous. The statute expressly defined the "persons" subject to the statute, and expressly excluded state and local governments and agencies. 31 U.S.C. § 3701(c). The Supreme Court rejected the argument that Congress intended to preempt the preexisting federal common law, thus relieving states of their obligation under prior law to pay prejudgment interest. The Court held that the statute did not "speak directly" to the obligation of the states, but rather was intended to reach only the obli-

---

**17.** Also, of course, the Supreme Court in *D'Oench* initially identified this special area of federal concern as having been revealed in provi- sions of the Federal Reserve Act which that opinion construed. 315 U.S. at 456–57, 62 S.Ct. at 679.

gations of private debtors. The Court was influenced by the evident purpose of the statute—to increase the efficiency of the government's debt collections. The contrary reading "would have the anomalous effect of placing delinquent States in a position where they had less incentive to pay their debts." *Id.* at 537, 113 S.Ct. at 1636. The Court rejected that interpretation, which would undermine the evident purpose of the statute.

Similarly, the question in the instant case is whether or not it is "evident" that Congress intended to preempt the longstanding federal common law *D'Oench* doctrine. There is no indication in the statute or the legislative histories of either the 1950 or the 1989 acts that Congress intended to preempt the federal common law. *See FDIC v. McClanahan*, 795 F.2d 512, 514 n. 1 (5th Cir.1986) (noting that the legislative history of the 1950 act does not mention the *D'Oench* decision and concluding that Congress did not preempt *D'Oench* by enacting § 1823(e)); *In re NBW Commercial Paper Litigation*, 826 F.Supp. 1448, 1459 (D.D.C.1992) (noting that the legislative history of FIRREA is "scant" with respect to the *D'Oench* doctrine and finding no indication that Congress intended to preempt it). Just as it had done in 1950, Congress in FIRREA incorporated parts of the evolving common law *D'Oench* doctrine, e.g., its application in both the corporate and receivership capacities, and its application to affirmative claims as well as defenses. Although the legislative history with respect to these two sections of the mammoth FIRREA is sparse, what little there is suggests that Congress intended no change in existing law. *See, e.g.,* H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 332, *reprinted in* 1989 U.S.Code Cong. & Admin.News 128 (describing FIRREA's addition of § 1821(d)(9)(A): "In general [FIRREA] provides, as the FDI Act *presently* provides, that no agreement can form the basis of a claim against the Corporation or the conservator or receiver unless it is in writing and properly approved and maintained in the records of the institution.") (emphasis added); *id.* at 335, 1989 U.S.Code Cong. & Admin.News 131 (describing the provision of FIRREA allowing the FDIC in its receiver-

ship capacity to invoke § 1823(e) as a clarification of prior law).

Significantly, neither FIRREA in general, nor §§ 1821(d)(9)(A) and 1823(e)(1) in particular, comprehensively address the *substance* of the federal common law *D'Oench* doctrine. The particular argument that Motorcity raises in this case—i.e., that §§ 1821(d)(9)(A) and 1823(e)(1) do not bar claims based on oral agreements with a failed bank if the borrower's loan is repaid before the FDIC takes over—reflects an issue which was not addressed at all by Congress in 1989. Congress did not focus on the *range* of secret agreements with respect to which the FDIC would be afforded protection. Rather, in this regard, the only relevant language is in § 1823(e)(1), which Congress merely carried over from the statute originally enacted in 1950. We therefore see no indication either in the language of the statute itself or in the legislative history that Congress undertook a comprehensive examination of the federal common law *D'Oench* doctrine, or made any attempt to address comprehensively that vast doctrine. "[S]uch reticence while contemplating an important and controversial change in existing law is unlikely.... At the very least, one would expect some hint of a purpose to work such a change, but there was none." *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266–67, 99 S.Ct. 2753, 2759–60, 61 L.Ed.2d 521 (1979).

Congress' purpose in passing FIRREA was to strengthen the FDIC's long-established right to protect itself from secret agreements executed by failing banks. *See Gibson v. RTC*, 51 F.3d 1016, 1020 (11th Cir.1995) ("Congress enacted FIRREA in 1989 in response to the growing crisis in the nation's banking and savings and loan industries."). One important goal of FIRREA was "to give the FDIC power to take all actions necessary to resolve the problems posed by a financial institution in default." *FDIC v. Wright*, 942 F.2d 1089, 1095–96 (7th Cir.1991) (quoting H.R.Rep. No. 54(I), 101st Cong., 1st Sess. 330, *reprinted in* 1989 U.S.Code Cong. & Admin.News 126), *cert. denied*, 504 U.S. 909, 112 S.Ct. 1937, 118 L.Ed.2d 544 (1992). The coexistence of the

common law *D'Oench* doctrine and the statutory scheme presents no inconsistency with this purpose. Indeed, the history of the interaction between the *D'Oench* common law and the statute strongly indicates that Congress did not intend preemption. The statute at issue began in 1950 as a partial codification of the *D'Oench* case. Subsequently, just as the *D'Oench* decision itself was a common law rule fashioned to fill the interstices of federal statutes, courts continued to apply the common law *D'Oench* doctrine beyond the confines of the statutory language in order to fulfill Congress' purposes in enacting § 1823(e)(1). Thereafter, in the intervening forty years, the common law *D'Oench* doctrine and the cases under the statute evolved together, each drawing upon the other. The Supreme Court in *Langley v. FDIC*, 484 U.S. 86, 92–93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987), interpreted the statute broadly in order to serve the purpose of the common law *D'Oench* case. Since the creation of § 1823(e)(1) in 1950, innumerable cases in every circuit court of appeals have held that the common law *D'Oench* doctrine and the statute continued to apply and complement each other. Thus, in 1989, when Congress addressed this special area of federal concern as a small part of the overall crisis in the banking industry, Congress was looking at forty years of harmonious coexistence of the common law doctrine and the statute. When Congress merely carried over the substance of the § 1823(e)(1) language, we believe that the most reasonable reading of the congressional intent is that Congress codified parts of the evolving *D'Oench* common law, left the state of the law unchanged, and left in place both the statute and the federal common law *D'Oench* doctrine to fill in the inevitable gaps left by the statutory language. *See Inn at Saratoga Assocs. v. FDIC*, 60 F.3d 78, 82 (2d Cir.1995) (adhering to the common law *D'Oench* doctrine to fill in a gap left by the statute because failing to do so "would undercut an important purpose of [the *D'Oench*] doctrine—allowing the FDIC to rely on a bank's records when insuring the bank"); *NBW Commercial Paper*, 826 F.Supp. at 1460–61 ("While both *D'Oench* and the statutory provisions protect similar interests of

the government, each is capable of a somewhat independent interpretation, ... so that they do not completely overlap. It is this added protection given by *D'Oench*, which Congress has neither codified nor demonstrated any intent to repudiate, that remains viable in the interstices of FIRREA.... *D'Oench* can best be described as a safety net which Congress has left to insure that the specific wording of the statute does not prevent the true application of Congress' policies."). The common law doctrine has served the important function of filling the inevitable gaps left by the statutory language.

We conclude that it is even clearer in this case than in *Texas* that Congress did not intend to preempt the prior federal common law *D'Oench* doctrine. *Texas* held that the statute did not "speak directly" to the issue, notwithstanding the fact that the statute addressed the area of the government's debt collection and addressed prejudgment interest in particular, and notwithstanding the fact that Congress expressly excluded states from the operation of the statute. In the instant case, no language in the statute refers directly to the common law *D'Oench* doctrine. The only language in the statute even relevant to the issue presented by Motorcity—the range of oral agreements with respect to which the FDIC will be protected—is found in § 1823(e)(1), and its language was merely carried over intact from prior law.

As in *Texas*, our conclusion is supported by the evident purpose of FIRREA—to enhance the FDIC's ability to address the problems created by the increasing number of financial institutions in default. As in *Texas*, Motorcity's construction would have the "anomalous effect" of undermining the purposes of FIRREA. Specifically, Motorcity's interpretation seeks to take advantage of oral agreements, evading the statute and *D'Oench* merely because Motorcity has paid off its loan. Such an interpretation would undermine the core purpose of both the *D'Oench* doctrine and its statutory cousins, i.e., allowing the FDIC to make its necessary decisions and evaluations, which sometimes

must be made with lightning speed, by relying on the written bank records.

For the foregoing reasons, we therefore hold that neither FIRREA, nor the Federal Deposit Insurance Act of 1950, preempted the federal common law *D'Oench* doctrine.

**B.** *Can Motorcity Avoid the D'Oench Doctrine if it Repaid its Loans to Southeast Prior to Bringing this Lawsuit?*

Our conclusion that the *D'Oench* doctrine has not been preempted by statute is reinforced by an examination of Motorcity's argument that §§ 1821(d)(9)(A) and 1823(e)(1) are inapplicable because Motorcity repaid its loan to Southeast before the FDIC was appointed receiver. Pointing to § 1823(e)(1)'s reference to an "agreement which tends to diminish or defeat the [FDIC's] interest ... in any asset acquired by it," Motorcity contends that § 1823(e)(1) does not bar any claims against the FDIC that do not affect the value of a specific asset of the bank, such as a note, acquired by the FDIC. Because it repaid its note, Motorcity argues that there is no longer any specific asset to which the alleged oral agreements relate. *See Murphy v. FDIC*, 61 F.3d 34, 37 (D.C.Cir.1995) (holding that § 1823(e) applies only when the FDIC's interest in a specific asset would be impaired by the alleged secret agreement); *Inn at Saratoga Assocs. v. FDIC*, 60 F.3d 78 (2d Cir.1995) (holding that a promise to make a loan is not covered by § 1823(e) because a promise is not an "asset"); *John v. RTC*, 39 F.3d 773, 776–77 (7th Cir.1994) ("Section 1823(e) requires an identifiable 'asset' which is acquired by the bank and then transferred to the regulatory agency, and to which the unenforceable agreements must relate."); *Murphy v. FDIC*, 38 F.3d 1490, 1500 (9th Cir.1994) (en banc) (holding that § 1823(e) does not apply to a claim relating to a letter of credit; a letter of credit is a liability, not an asset); *Thigpen v. Sparks*, 983 F.2d 644, 648–49 (5th Cir.1993) (analyzing both §§ 1821(d)(9)(A) and 1823(e) and concluding that these statutes are limited by a "specific asset" requirement); *FDIC v. Bracero & Rivera, Inc.*, 895 F.2d 824, 830 (1st Cir.1990) (where a note was discharged by the payment and cancellation of the underlying debt before the FDIC ever obtained it, the note was not an "asset" protected by § 1823(e)) (dicta); *Commerce Federal Sav. Bank v. FDIC*, 872 F.2d 1240, 1246 (6th Cir.1989) (where the indebtedness secured by a deed of trust is extinguished by operation of law before the FDIC acquires the failed bank, the FDIC has acquired no asset and therefore may not invoke § 1823(e)).

 In light of our holding that the federal common law *D'Oench* doctrine has not been preempted, we need not decide whether §§ 1821(d)(9)(A) or 1823(e)(1) are limited to claims that impair the FDIC's interest in a specific asset. *See Brookside Assocs. v. Rifkin*, 49 F.3d 490, 495 (9th Cir.1995) (declining to address the extent to which § 1823(e) is limited by a specific asset requirement because the common law *D'Oench* doctrine is not so limited). Instead, we reaffirm the principle that the common law *D'Oench* doctrine is not limited to claims relating to a specific asset of the bank that has been acquired by the FDIC. *RTC v. Dunmar Corp.*, 43 F.3d 587, 594–95, 597 (11th Cir.) (en banc) (holding that, regardless of whether a specific asset is involved, *D'Oench* applies to claims or defenses that relate to ordinary banking transactions), *cert. denied sub nom. Jones v. RTC*, —— U.S. ——, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *OPS Shopping Ctr., Inc. v. FDIC*, 992 F.2d 306, 309 (11th Cir. 1993) (rejecting the argument that the common law *D'Oench* doctrine is limited by a specific asset requirement). Other circuits are in agreement on this issue. *See, e.g., Inn at Saratoga Assocs. v. FDIC*, 60 F.3d 78, 82 (2d Cir.1995) (rejecting the argument that the *D'Oench* doctrine is limited by an "asset" requirement, because such a requirement "would undercut an important purpose of that doctrine—allowing the FDIC to rely on a bank's records when insuring the bank"); *Brookside Assocs. v. Rifkin*, 49 F.3d 490, 496 (9th Cir.1995) ("[W]e hold that the common-law [*D'Oench*] doctrine applies to bar suit even when the RTC does not acquire a specific asset whose value is affected by the alleged secret agreement."); *Jackson v. FDIC*, 981 F.2d 730, 734–35 (5th Cir.1992) (holding that claims that do not diminish or defeat the FDIC's interest in any specific

asset are nevertheless *D'Oench* barred, in light of the "established purpose of the [*D'Oench*] doctrine" to protect the FDIC's reliance on the bank's records); *Timberland Design, Inc. v. First Serv. Bank for Sav.,* 932 F.2d 46, 49–50 (1st Cir.1991) (per curiam) ("*D'Oench* protects the FDIC from Timberland's affirmative claims which are based upon an alleged oral agreement to lend money in the future."); *Hall v. FDIC,* 920 F.2d 334, 339 (6th Cir.1990) ("*D'Oench* is important for allowing banking authorities to determine exactly what a bank's assets and liabilities are ... [and] may therefore be invoked even where FDIC does not have 'an interest in an asset.'"), *cert. denied,* 501 U.S. 1231, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991).

Motorcity's argument, that repaying a loan before filing tort claims precludes the FDIC from invoking the *D'Oench* doctrine, would result in absurdity. For example, suppose that a plaintiff wished to bring tort claims against the FDIC on the basis of alleged oral representations made by the failed bank in connection with the negotiation of the plaintiff's loan, and suppose that the alleged oral representations contradict the written loan terms. This hypothetical plaintiff's claims would fall within the core of the *D'Oench* doctrine and would be barred. *See In re Geri Zahn, Inc.,* 25 F.3d 1539, 1544 (11th Cir.1994). Under Motorcity's argument, however, the plaintiff could circumvent the *D'Oench* bar simply by paying off the balance of his or her loan before filing suit, leaving the FDIC without an interest in a specific asset. Such a result would seriously undermine the policies of the *D'Oench* doctrine: to protect the bank examiners who rely on the bank's records in assessing the bank's condition, to protect the FDIC's ability to insure deposits, and to place the burden on borrowers to make sure that all of the terms of their loan agreements are in writing.

The Ninth and Sixth Circuits have held that the *D'Oench* doctrine cannot be avoided by repaying a loan before filing suit. In *Brookside,* the plaintiff brought fraud claims against the RTC, as receiver for a failed bank, alleging that the bank's officials misrepresented the appraised value of some con-dominiums. 49 F.3d at 490. In reliance on the alleged misrepresentations, the plaintiff purchased the condominiums, executing a nonrecourse note and first deed of trust in favor of the bank. The plaintiff defaulted on its loan, and the bank foreclosed on the condominiums. Six months later, the RTC took over the failed bank. At that time, the plaintiff's note and deed of trust were no longer on the bank's books because they had been extinguished by the foreclosure sale. The plaintiff argued that the *D'Oench* doctrine did not apply, because the fraud claims did not diminish the RTC's interest in a specific asset it had acquired from the bank. The Ninth Circuit squarely rejected the plaintiff's argument:

> [T]o strip the banking authority of *D'Oench, Duhme* protection [in this situation] would give debtors a message: If you relied on unrecorded representations when you borrowed from the bank, wait until your note is extinguished—or extinguish it yourself by paying it off—before you file suit. It does not make sense, in light of *D'Oench, Duhme* policy, to allow the doctrine's applicability to hinge on a procedural technicality easily manipulable by debtors.

*Id.* at 496.

Similarly, in *Hall,* the plaintiffs sued the FSLIC as receiver of a failed bank ("Commerce"), seeking damages arising out of Commerce's breach of an unwritten agreement to advance additional funds on the plaintiffs' loan. 920 F.2d at 334. Approximately three years before Commerce fell into receivership, the plaintiffs secured a loan from another bank and repaid the Commerce loan. The plaintiffs argued that, because they owed Commerce nothing when the FSLIC took it over, the FSLIC had no interest in any specific Commerce asset and thus the *D'Oench* doctrine did not apply. The Sixth Circuit rejected the plaintiffs' argument:

> There are ... instances where FDIC no longer has an interest in an asset, but where the logic of *D'Oench* should still apply to protect FDIC. For example, an obligor and a bank in receivership might have mutual breach of contract claims

growing out of loan documents in the bank's records. The obligor, anticipating a suit by FDIC, might quickly pay off the note in an attempt to block FDIC's resort to the *D'Oench* doctrine. Under these circumstances, the fact that the obligor paid off the debt so as that FDIC did not have "an interest in an asset" should not prohibit FDIC from invoking *D'Oench.*

*Id.* at 339.

▆▆ Because the common law *D'Oench* doctrine has not been preempted, and because the common law *D'Oench* doctrine is not limited by a specific asset requirement, Motorcity's repayment of its loan does not preclude the application of the *D'Oench* bar. We now turn to the application of the *D'Oench* doctrine to Motorcity's proposed tort claims.

C. *Application of D'Oench; Are Motorcity's Claims "Free Standing" Torts?*

The gravamen of Motorcity's complaint is that Southeast should have notified Motorcity's absentee owners that out-of-trust sales were occurring at the automobile dealership. Motorcity does not argue that Southeast breached the written floor plan financing agreement. As the district court found, the written agreement imposes no duty on Southeast to monitor the dealership for the benefit of Motorcity and no duty to inform Motorcity of any out-of-trust sales.

▆▆ Motorcity does not challenge the district court's reading of the written contract; rather, Motorcity relies primarily on alleged oral agreements and representations that Southeast would monitor the business not only for its own benefit but also for the benefit of Motorcity's absentee owners. However, because the FDIC was entitled to rely on the bank's records to ascertain the extent of the bank's contractual obligations pursuant to the floor plan financing arrangement, *D'Oench* prevents Motorcity from offering extrinsic evidence to alter or to explain the written loan terms. *FSLIC v. Two Rivers Assocs., Inc.,* 880 F.2d 1267, 1276 (11th Cir.1989) (refusing to consider extrinsic

evidence to interpret loan terms, because such evidence was not reflected in the bank's records); *FDIC v. Merchants Nat'l Bank of Mobile,* 725 F.2d 634, 639 (11th Cir.) (rejecting the use of extrinsic evidence not meeting the requirements of § 1823(e), including "intent of the parties" and the "surrounding circumstances," to determine whether the bank's participation in a loan was guaranteed by the Farmers Home Administration), *cert. denied,* 469 U.S. 829, 105 S.Ct. 114, 83 L.Ed.2d 57 (1984); *FDIC v. Bay Street Dev. Corp.,* 32 F.3d 636, 639–40 (1st Cir.1994) ("[O]f course, extrinsic evidence of additional [loan] terms is inadmissible against FDIC."); *RTC v. Daddona,* 9 F.3d 312, 319 (3rd Cir. 1993) ("[N]ot only does the existence of the agreement have to appear plainly on the face of an obligation, but the basic structure of that agreement—its essential terms—must also appear plainly on the face of that obligation."); *Community Bank of the Ozarks v. FDIC,* 984 F.2d 254, 257 (8th Cir.1993) ("Neither section 1823(e) nor *D'Oench* is satisfied by inferences drawn from a bank's records.").

Thus barred from any contract claim based on either written or oral agreements, Motorcity argues that its proposed claims against the FDIC are tort claims that are not related to the floor plan financing agreement. Specifically, Motorcity contends that Southeast breached an alleged fiduciary duty to notify Motorcity of the out-of-trust sales discovered in the course of Southeast's audits, and that Southeast acted negligently by conducting its audits in an unreasonable and incompetent fashion. Motorcity argues that these two claims fall within the "narrow exception" to the *D'Oench* doctrine for "free standing tort claims." *In re Geri Zahn,* 25 F.3d 1539, 1543 (11th Cir.1994).

▆▆ The *D'Oench* doctrine bars all claims—even those sounding in tort—that are "sufficiently intertwined with regular banking transactions, such that exclusion of the alleged 'secret agreement' accords with the underlying policies of *D'Oench.*" *Id.* at 1543; *OPS Shopping Ctr. v. FDIC,* 992 F.2d 306, 310 (11th Cir.1993).[18] In other words, a

---

**18.** The principal policies underlying the *D'Oench* doctrine are (1) to permit federal and state bank

examiners to rely upon the bank's records of regular banking transactions in evaluating the

tort claim involving any "scheme or arrangement whereby the banking authority is likely to be misled" cannot be asserted against the banking authority. *RTC v. Dunmar Corp.*, 43 F.3d 587, 593 (11th Cir.) (en banc), *cert. denied sub nom. Jones v. RTC,* — U.S. ——, 116 S.Ct. 74, 133 L.Ed.2d 33 (1995); *see also Langley v. FDIC,* 484 U.S. 86, 92–93, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987) (explaining that the term "agreement" in § 1823(e) should be interpreted broadly to comport with the policies underlying the common law *D'Oench* doctrine). In *Langley,* for example, the borrower attempted to defend against a note that had been acquired by the FDIC by arguing that the note had been procured by the bank's oral misrepresentations about the acreage of the mortgaged property, the extent of the mineral deposits, and the presence of preexisting mineral rights leases. *Id.* at 89, 108 S.Ct. at 400. Because these alleged fraudulent misrepresentations of fact occurred during discussions surrounding an ordinary banking transaction and involved matters that should have been included in the documents contained in the bank's records, the Supreme Court held that the misrepresentations constituted "agreements" under § 1823(e)(1). Thus, the Langleys' fraud defense was barred, notwithstanding the fact that it sounded in tort. *Id.* at 96, 108 S.Ct. at 403.

*Dunmar* involved a borrower's tort claims arising from a failed S & L's oral representations that it would lend additional monies to the borrower, extend the time for payment of a loan, and permit a qualified buyer to assume the borrower's mortgage. 43 F.3d at 587. Because "the nature of each alleged oral agreement or representation relates to regular banking transactions and should have been documented in the bank records," we held that the *D'Oench* doctrine barred the borrower's tort claims. *Id.* at 595. Similarly, *In re Geri Zahn* involved claims of fraud, wrongful dishonor, and intentional interference with a business relationship. 25 F.3d at 1539. These claims arose out of agreements and misrepresentations alleged to have oc-

curred during loan negotiations, and they contradicted the express terms of the loan documentation. We held that the claims fell "well within the core of the *D'Oench* bar," because "[t]he alleged oral agreements were obviously part and parcel of the loan negotiations" and involved "matters which would normally be reflected in the records of regular banking transactions." *Id.* at 1544.

This circuit's decision in *OPS* is also relevant. 992 F.2d at 306. In that case, the plaintiff sued the bank for its refusal to pay on a letter of credit that was not reflected in any of the bank's records. The court held that the *D'Oench* doctrine barred the plaintiff's claims against the FDIC, citing the principle that " 'a private party may not enforce against a federal deposit insurer any obligation not specifically memorialized in a written document such that the agency would be aware of the obligation when conducting an examination of the institution's records.' " *Id.* at 308 (quoting *Baumann v. Savers Fed. Sav. & Loan Ass'n,* 934 F.2d 1506, 1515 (11th Cir.1991), *cert. denied,* 504 U.S. 908, 112 S.Ct. 1936, 118 L.Ed.2d 543 (1992)). Because the claims in *OPS* related directly to ordinary banking transactions (i.e., the rights and obligations relating to the issuance of a letter of credit by the bank), banking examiners reasonably would expect the records of regular banking transactions to reflect the plaintiff's letter of credit, and thus the *D'Oench* bar applied. *Id.* at 310.

In deciding that the *D'Oench* doctrine barred the plaintiff's claims against the FDIC, the *OPS* court extensively discussed the scope of the free standing tort exception articulated in *Vernon v. FDIC,* 981 F.2d 1230 (11th Cir.1993) (*Vernon II* ). The tort claims in *Vernon II* involved alleged violations of securities laws and related claims arising from the claimants' purchase of preferred stock and warrants to purchase common stock in the failed institution itself. Because "the relevant records would reside in the department of the bank which handled the sale or transfer of the bank's own stock,"

institution's fiscal soundness; (2) to "ensure mature consideration of unusual loan transactions by senior bank officials," and (3) to "prevent fraudulent insertion of new terms, with the collu-

sion of bank employees, when a bank appears headed for failure." *Langley v. FDIC,* 484 U.S. 86, 91, 108 S.Ct. 396, 401, 98 L.Ed.2d 340 (1987).

and would not appear among the records of "regular banking transactions," the claims in *Vernon II* constituted free standing torts, not barred by the *D'Oench* doctrine. *OPS*, 992 F.2d at 310–11. Thus, the court drew a distinction: on the one hand, typical claims like employment discrimination and automobile accidents would be free standing torts not barred by *D'Oench;* on the other hand, those claims relating to "ordinary banking transactions" and imposing obligations on the bank with respect thereto—obligations that would ordinarily be reflected in the records of banking transactions—would be *D'Oench*-barred unless thus recorded. In deciding whether the free standing tort exception applies, therefore, "the key inquiry is one of relatedness" to ordinary banking transactions, and "the relatedness requirement rests upon the recognition that the *D'Oench* doctrine does not encompass those free standing torts which do not implicate the records of regular banking transactions." *In re Geri Zahn*, 25 F.3d at 1543–44. The *D'Oench* doctrine bars reliance on oral agreements to support tort claims that relate directly to ordinary banking transactions and involve obligations of the lender that should be reflected in the records of regular banking transactions. *Id.* at 1544.

■ Motorcity's claim is based primarily upon alleged oral agreements and representations that Southeast would monitor the business for Motorcity's benefit, would conduct regular audits, and would advise Motorcity of any irregularities, especially out-of-trust sales.[19] Motorcity claims that such representations were made during the negotiations preceding the signing of the floor plan financing agreement and during the implementation thereof. It is clear that any such negotiations and representations are intimately related to the floor plan financing agreement and should have been reflected in the written agreement. Southeast's alleged promises and representations were "part and parcel" of the loan negotiations, and as such relate directly to the financing agreement, a regular banking transaction. *In re Geri Zahn*, 25 F.3d at 1544. Because "[b]anking examiners who inspect and evaluate the bank records reasonably expect the records of regular banking transactions to reflect *all* of the rights and liabilities of the bank regarding such regular banking transactions," *OPS*, 992 F.2d at 310, it follows that banking examiners would reasonably expect Southeast's undertaking of unusual duties to Motorcity to be reflected in such records. Moreover, it accords with the policies underlying § 1823(e)(1) and *D'Oench* to require such unusual undertakings by a lender to appear among the bank's records. *Langley*, 484 U.S. at 92, 108 S.Ct. at 401 (stating that one purpose fulfilled by § 1823(e)'s writing requirements is to "ensure mature consideration of unusual loan transactions by senior bank officials").

Motorcity seeks to impose additional obligations on Southeast directly related to the financing agreement, obligations which one would expect to be reflected in the bank's records. However, the written documents did not reflect such additional obligations, nor did they otherwise appear in the bank's records. We readily conclude that the very core of the *D'Oench* doctrine bars any reliance by Motorcity on such oral agreements and representations. The free standing tort exception does not apply.

D. *Dissecting Motorcity's Claims; Assessing Whether a Viable Claim Remains After Stripping Away Reliance on Oral Agreements*

In order to evaluate Motorcity's state law tort claims, we must focus precisely on the

---

**19.** Specifically, Motorcity alleges that Southeast acknowledged the concerns of Motorcity's absentee owners, and represented to Motorcity:

(1) that Southeast was experienced in handling floor plan financing, that it "knew what it was doing," and that it had handled floor plan financing for the largest car dealership in the country;

(2) that a senior executive at Southeast personally would manage the Motorcity account;

(3) that Southeast would audit the floor plan monthly and inform Motorcity's investors immediately upon discovering any irregularities, particularly with respect to out-of-trust sales; and

(4) that Southeast's duty to conduct audits and to inform Motorcity of the results would be set forth in the written agreement.

nature and contours of each. As noted above, the core of the *D'Oench* bar prevents any reliance by Motorcity on oral agreements. We must carefully examine the elements of each state law claim and the source of the obligations Motorcity seeks to impose on Southeast; only then can we assess whether there is any viable state law claim after stripping away all reliance upon oral agreements or representations.

Motorcity asserts two state law claims, one based on fiduciary duty and one on negligence. We first address the fiduciary duty claim.

### 1. Fiduciary Duty Claim

■■■■■ Motorcity's proposed fiduciary duty claim requires it to establish that Southeast voluntarily assumed an obligation to act for Motorcity's benefit. The claim that Southeast breached a fiduciary duty to notify Motorcity about the out-of-trust sales necessarily depends upon the existence of a fiduciary relationship. *See Barnett Bank of West Florida v. Hooper*, 498 So.2d 923, 925 (Fla.1986) ("The usual relationship between a bank and its depositor is one of debtor to creditor ... not ordinarily imposing a duty of disclosure ... [but where the bank] has established a relationship of trust and confidence ... the bank may be found to have assumed a duty to disclose facts.").[20] Under Florida law, it is clear that a lender does not ordinarily owe fiduciary duties to its borrower. *See, e.g., Keyes Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F.Supp. 1437, 1443 (S.D.Fla.1995) (holding that, under Florida law, a floor plan financing agreement does not create fiduciary duties); *Metcalf v. Leedy, Wheeler & Co.*, 140 Fla. 149, 191 So. 690 (1939) (holding that, in an arms-length transaction, there is no duty on either party to act for the benefit or protection of the other party); *Vassar v. Smith*, 134 Fla. 346, 183 So. 705 (1938) (same); *Edwards v. Lewis,*

98 Fla. 956, 124 So. 746 (1929) (same); *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 518 (Fla.App. 3 Dist.1994) ("Generally, the relationship between a bank and its borrower is that of creditor to debtor, in which the parties engage in arms-length transactions, and the bank owes no fiduciary responsibilities."), *review denied*, 659 So.2d 1086 (Fla.1995); *Watkins v. NCNB Nat'l Bank*, 622 So.2d 1063, 1065 (Fla.App. 3 Dist.1993) (same), *review denied*, 634 So.2d 629 (Fla.1994). In order to establish a fiduciary relationship, there must be an allegation of dependency by one party and a voluntary assumption of a duty by the other party to advise, counsel, and protect the weaker party. *Cripe v. Atlantic First Nat'l Bank*, 422 So.2d 820 (Fla. 1982); *Willis v. Fowler*, 102 Fla. 35, 136 So. 358 (1931); *Quinn v. Phipps*, 93 Fla. 805, 113 So. 419 (1927); *Watkins*, 622 So.2d at 1065. Stated differently, "the fact that one party places its trust in the other does not create a confidential relationship in the absence of some recognition, acceptance, or undertaking of the duties of a fiduciary on the part of the other party." *Bankest Imports, Inc. v. ISCA Corp.*, 717 F.Supp. 1537, 1541 (S.D.Fla.1989) (citing *Harris v. Zeuch*, 103 Fla. 183, 137 So. 135 (1931)). *See also Denison State Bank v. Madeira*, 230 Kan. 684, 640 P.2d 1235, 1244 (1982) ("[O]ne may not ... unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary.").

■■■■■ As noted above, the primary basis for Motorcity's allegation of a fiduciary relationship was the alleged oral agreements and representations by Southeast. Having determined that Motorcity cannot rely upon such oral representations to prove its allegations that Southeast voluntarily assumed a fiduciary duty, we now assess whether Motorcity has alleged any other source of a fiduciary duty. Motorcity suggests the fol-

---

20. *Hooper* also suggested that a bank's duty to disclose material facts to its customer might arise "where a bank, having actual knowledge of fraud being perpetrated upon a customer, enters into a transaction with that customer in furtherance of the fraud." *Id.* at 925. *See also Burger King Corp. v. Holder*, 844 F.Supp. 1528, 1532 (S.D.Fla.1993) (even without a fiduciary relation-

ship, a duty to disclose material information might arise when a bank, under circumstances rising to the level of fraud, discloses certain information that is misleading because it is incomplete). Motorcity does not argue that Southeast's failure to disclose the out-of-trust sales constituted actionable fraud.

lowing argument in its briefs. Motorcity argues that the act of auditing the dealership and sending the summary audit reports sufficiently alleges, as a matter of Florida law, that Southeast voluntarily assumed a fiduciary duty to perform the audits for Motorcity's benefit.[21] We conclude that the mere act of auditing the dealership and sending the summary audit reports does not constitute "circumstances exceeding an ordinary commercial transaction," *Capital Bank*, 644 So.2d at 521, and does not give rise to a fiduciary duty under Florida law.

▇ A bank that audits its borrower's inventory and sends the borrower a courtesy copy or a "summary audit report" has not acted inconsistently with its role as a lender, and therefore Florida courts would not infer a fiduciary duty under these circumstances. *See Pinnacle Port Community Ass'n v. Orenstein*, 872 F.2d 1536, 1540 (11th Cir.1989) (bank that became heavily involved in monitoring its borrower's business did not become a joint venturer because the bank's "actions are consistent with the role of a lender that became increasingly involved with the project to protect its collateral"); *Saglio v. Chrysler First Commercial Corp.*, 839 F.Supp. 830, 833 (M.D.Fla.1993) (rejecting

the existence of a fiduciary relationship between floor plan financing lender and guarantor where lender monitored borrower's inventory and provided periodic reports to guarantor); *Armetta v. Clevetrust Realty Investors*, 359 So.2d 540, 543 (Fla.App. 4 Dist.) (lender, who inspects construction project pursuant to right of inspection reserved in the loan agreement, is deemed to do so to protect its own interest in the loan; it has not acted beyond the role of a lender and thus owes no fiduciary duties), *cert. denied*, 366 So.2d 879 (Fla.1978); *Greiner v. Gen. Elec. Credit Corp.*, 215 So.2d 61, 63 (Fla.App. 4 Dist.1968) (declining to find joint venture element where arrangement arguably indicative of the element is a well accepted business method not restricted to joint ventures). We therefore hold that the district court did not commit error in dismissing Motorcity's breach of fiduciary duty claim.[22]

In this case, the written financing agreement gave Southeast the right to audit. The mere conduct of that audit and sending a summary report thereof to Motorcity were entirely consistent with its role as lender. We readily conclude that no fiduciary duty was created under Florida law.[23]

---

**21.** Motorcity also mentions that its principal, David Hess, was a long standing customer of Southeast's through his medical practice. However, it is clear that Southeast's long standing business relationship with Hess, without more, cannot transform the lender-borrower relationship into a fiduciary one. *See e.g., Barnett Bank of West Florida v. Hooper*, 498 So.2d 923, 925 (Fla.1986); *Klein v. First Edina Nat'l Bank*, 293 Minn. 418, 196 N.W.2d 619, 624 (1972) ("The fact that plaintiff had done business with [the bank] for nearly twenty years could not by itself place [the bank] in a confidential relation to plaintiff.").

**22.** Indeed, it is not surprising that Motorcity is unable to locate a single Florida case that imposes fiduciary-type duties on a bank without relying on oral representations. *See Burger King Corp. v. Holder*, 844 F.Supp. 1528, 1532 (S.D.Fla.1993) (borrower's allegations in support of a bank's fiduciary duty to disclose material information to borrower included "affirmative representations" that the bank "would assume certain responsibilities and duties" on borrower's behalf); *Barnett Bank*, 498 So.2d at 924 (bank officer orally told loan customer "that he was familiar with Hosner Investments and that they were sound and had passed Internal Revenue scrutiny"); *Capital*

*Bank v. MVB, Inc.*, 644 So.2d 515 (Fla.App. 3 Dist.1994) (bank officer "expressly invited [customer's] reliance by urging [customer] to trust him and by reassuring [customer] that he was part of the Capital Bank family"; bank's "role exceeded that of a lender in a traditional lender/borrower relationship"), *review denied*, 659 So.2d 1086 (Fla.1995); *Chotka v. Fidelco Growth Investors*, 383 So.2d 1169, 1170 (Fla.App. 2 Dist. 1980) (bank "became more than just a lender when [it] took title to the condominium project, completed construction, and, holding [itself] out to be the developer and owner of the project, advertised and sold units to purchasers.").

**23.** Because Motorcity's fiduciary duty claim fails as a matter of Florida law, and because its negligence claim also fails under Florida law, *see infra*, we need not address the argument that nonverbal course of conduct evidence (such as the audit here) is *D'Oench*-barred, just like oral evidence, because it does not appear in the bank's records. *See Hall v. FDIC*, 920 F.2d 334, 340 (6th Cir.1990) (holding that *D'Oench* prevents borrowers from arguing that a condition in a loan agreement has been waived by the bank's nonverbal conduct at the loan closing), *cert. denied*, 501 U.S. 1231, 111 S.Ct. 2852, 115 L.Ed.2d 1020 (1991); *Beighley v. FDIC*, 868 F.2d 776,

#### 2. Negligence Claim

Motorcity's other state law claim is based upon negligence. Having stripped away any proper reliance by Motorcity upon oral agreements or representations, we must determine whether Motorcity can state a viable negligence claim based merely upon the fact that Southeast conducted the audit and sent summary reports thereof.

The voluntary assumption of a duty to protect Motorcity is also a necessary element of Motorcity's claim that the negligent performance of the floor plan audits caused its financial losses. Under Florida law, no defendant may be held liable for negligence unless he or she owes a legal duty to protect the plaintiff from harm. *Cooper Hotel Servs., Inc. v. MacFarland*, 662 So.2d 710, 712 (Fla.App. 2 Dist.1995), *review denied*, 670 So.2d 939 (Fla.1996); *Paterson v. Deeb*, 472 So.2d 1210, 1214 (Fla.App. 1 Dist. 1985), *review denied sub nom., Langston v. Paterson*, 484 So.2d 9 (Fla.1986). With respect to loan transactions, Florida law does not impose any duty on the lender to monitor the projects it finances for the protection of the borrower. *See Chotka v. Fidelco Growth Investors*, 383 So.2d 1169, 1170 (Fla.App. 2 Dist.1980) ("[A] lender is not under any duty to inspect the progress of construction for the benefit of anyone other than itself ..." even if the loan provisions allow the lender to inspect the construction.). To be held liable for negligence, then, the bank must somehow *voluntarily assume* a duty to protect the borrower through the performance of the audits. *Saglio v. Chrysler First Commercial Corp.*, 839 F.Supp. 830, 834 (M.D.Fla.1993) ("[T]he law does not impose a duty upon [the lender] to reasonably perform inventory checks for [the guarantor's] benefit, [but] liability for misfeasance can lie where a party *voluntarily assumes a duty*." (emphasis added)); *Capital Bank v. MVB, Inc.*, 644 So.2d 515, 521 (Fla.App. 3 Dist.1994) ("Where the lender has *voluntarily assumed* additional roles, accompanying responsibilities properly follow." (emphasis added)), *review denied*,

659 So.2d 1086 (Fla.1995). In this sense, Motorcity's negligence claim is similar to its breach of fiduciary duty claim, in that both tort claims require Southeast to have voluntarily assumed some kind of duty to act for Motorcity's benefit and protection.

Motorcity suggests that *Saglio, supra*, supports its contention that Southeast voluntarily assumed a tort duty to Motorcity. In *Saglio*, a guarantor of a loan alleged that a floor plan financing lender had voluntarily assumed a duty to audit the borrower's inventory for the guarantor's benefit, even though the written contract between the lender and the guarantor did not require the lender to do so. *Id.* at 833–34. During the course of the loan, the lender routinely conducted audits and submitted reports of its inventory checks to the guarantor. According to the court, this created a material issue of fact regarding whether the lender and the guarantor had modified their written contract through their conduct, and the court therefore allowed the guarantor's breach of contract claim to survive summary judgment. *Id.* Thus, although finding no fiduciary duty, the court found a contractual duty. Relying on dicta in *Banfield v. Addington*, 104 Fla. 661, 140 So. 893 (1932), the court also held that the lender could be held liable for negligence if it had failed to discharge its *contractual* duty to conduct audits on behalf of the guarantor with reasonable care.

The *Saglio* court's finding that the lender's audit activities could constitute the necessary voluntary assumption of a duty may have been dependent upon its finding of a contractual duty. If so, *Saglio* is distinguishable, because Motorcity—in its effort to avoid the *D'Oench* bar—has abandoned any contract claim. In any event, to the extent that *Saglio* suggests that the mere audit activities of a lender, as here, can give rise to the voluntary assumption of a duty in negligence, we find it unpersuasive.

783 (5th Cir.1989) (explaining that any inference derived from a bank's effort to help the borrower sell collateral would not appear in the bank's records and thus would be barred by § 1823(e)); *FDIC v. Hamilton*, 939 F.2d 1225, 1229 (5th

Cir.1991) ("The rationale which bars claims based on oral agreements and collateral writings is equally applicable to claims based on unwritten, albeit widespread and prevailing, banking customs.").

We believe such a holding would be inconsistent with the Florida case law. The Florida courts have never applied the rationale of the *Banfield* dicta [24] to infer a tort duty when the actions taken are taken for the actor's own benefit. Indeed, the very statement of the rule of the *Banfield* dicta in the cases cited by the district court in *Saglio* highlights the fact that the rule applies only where actions are undertaken *for the benefit of another. See Barfield v. Langley*, 432 So.2d 748, 749 (Fla.App. 2 Dist.1983) (explaining that "action undertaken for the benefit of another . . . must be performed in accordance with an obligation to exercise reasonable care"); *Kaufman v. A–1 Bus Lines, Inc.*, 416 So.2d 863 (Fla.App. 3 Dist.1982) (same); *Padgett v. Sch. Bd. of Escambia County*, 395 So.2d 584 (Fla.App. 1 Dist.1981) (same).

The only Florida cases which have squarely addressed the question of whether a duty is to be inferred from actions taken by a party for its own benefit have squarely rejected the inference of a duty. In *Rice v. First Fed. Sav. & Loan Ass'n*, 207 So.2d 22, 23 (Fla.App. 2 Dist.) (per curiam), *cert. denied*, 212 So.2d 879 (Fla.1968), for example, a mortgage lender conducted frequent inspections of the borrower's construction site and charged the borrower an "inspection and supervision" fee. The lender's inspections failed to reveal certain construction defects, which caused considerable damage to the borrower. The borrower sued the lender for negligent inspection, thus breaching an implied contractual obligation. The borrower claimed that by undertaking to inspect the construction site and charging the borrower a fee therefor, the lender voluntarily assumed a duty to inspect the construction site with reasonable care for the borrower's benefit. The court flatly rejected the borrower's argument. Because a reasonable lender would be expected to inspect the construction site to protect its own interest in the mortgage, the court concluded that it would be "unreasonable" to infer from the bank's conduct that the bank had assumed a duty to perform the inspections on the *borrower's* behalf. *Id.*

Similarly, in *Armetta v. Clevetrust Realty Investors*, 359 So.2d 540 (Fla.App. 4 Dist. 1978), the Florida court rejected a claim very similar to Motorcity's claim. There, the lender made a loan to a developer of a condominium construction project. Several condominium purchasers sought to impose liability on the lender "for a variety of alleged negligent acts in supervising the developer's actions." *Id.* at 542. Rejecting the debtor's negligence claim, as well as other claims, the court held: "A lender owes no duty to others to supervise the construction and development of projects which it has financed." *Id.* at 543.

Motorcity suggests that its complaint goes beyond *Rice* and *Armetta* because it alleges that Southeast periodically sent Motorcity summary reports of the audits. We do not believe that this allegation changes the result in this case. As a matter of common experience, it does not seem unusual for the lender to audit its borrower's business and, as a courtesy, to provide the borrower with a summary of the audit reports. Rather, such action is entirely consistent with the usual role of a lender. It would be unreasonable to infer from this everyday occurrence that Southeast voluntarily assumed a duty to audit the dealership for Motorcity's benefit and protection. In any event, it is implicit in both *Rice* and *Armetta* that the plaintiff was aware of the results of the lender's inspections; the claim was not that the lender failed to inform the plaintiff of defects revealed by the inspections, but rather the claim was that the inspections negligently failed to uncover the defects. We believe *Rice* and *Armetta* control the outcome of this case.

 We conclude that the Florida case law would imply a tort duty only when actions are undertaken *for the benefit of another.* It would be inconsistent with well-established Florida law to infer a tort duty

---

**24.** The *Banfield* dicta was to the effect that a duty in negligence arises where a person undertakes a course of action. However, *Banfield* was an ordinary tort case imposing a duty on the owner of a beauty parlor to exercise ordinary care in the administration of a permanent wave on a customer's hair. 140 So. at 893.

merely on account of actions undertaken pursuant to the protection of one's own interests.[25]

Motorcity's negligence claim also fails for another, entirely independent reason; it is barred by Florida's "economic loss" rule. In *AFM Corp. v. Southern Bell Telephone & Telegraph Co.*, 515 So.2d 180 (Fla. 1987), the Florida Supreme Court held that a purchaser of services may not recover purely economic losses[26] in tort unless the other party's conduct establishes a "tort 'distinguishable from or independent of [the] breach of contract.'" *Id.* at 181 (citing *Lewis v. Guthartz*, 428 So.2d 222, 224 (Fla.1982)). *See also East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). Following the *AFM* decision, courts have applied the economic loss rule to contracts involving financial services, including loans. *See, e.g., Interstate Sec. Corp. v. Hayes Corp.*, 920 F.2d 769 (11th Cir.1991) (applying Florida's economic loss rule to a contract for financial services); *Keyes Jeep Eagle, Inc. v. Chrysler Corp.*, 897 F.Supp. 1437 (S.D.Fla.1995) (applying economic loss rule to floor plan financing agreement); *Strickland–Collins Const. v. Barnett Bank*, 545 So.2d 476 (Fla.App. 2 Dist.1989) (applying economic loss rule to construction loan agreement). The rationale underlying the economic loss rule is that parties who have allocated risks among themselves by contract should not be permitted to ignore their bargain after incurring a loss involving the subject matter of the contract. *See Airport Rent–A–Car, Inc. v. Prevost Car, Inc.*, 660 So.2d 628, 630 (Fla.1995) (holding that, in the absence of personal injury or damage to property outside the scope of the parties' contract, there is "no reason to burden society as a whole with the losses of one who has failed to bargain for adequate contractual remedies...."); *Florida Power*

*& Light Co. v. Westinghouse Elec. Corp.*, 510 So.2d 899, 902 (Fla.1987) (finding "no reason to intrude into the parties' allocation of risk by imposing a tort duty and corresponding cost burden on the public" and holding that "contract principles [are] more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage"); *Strickland–Collins*, 545 So.2d at 476 (economic loss rule bars suit by general contractor against developer's lender for negligent failure to prevent the developer from misappropriating the loan proceeds; because general contractor participated in the loan negotiations and signed the loan agreement, the general contractor should have bargained for the lender's assumption of a *contractual* duty to supervise its borrower).

Motorcity asserts that the economic loss rule does not apply here because Southeast's tort is "independent" of the contract. Motorcity suggests that the tort is independent because the floor plan financing agreement does not address the risk that the bank might send Motorcity negligently-prepared audits.

While it is true that the economic loss rule would not bar a tort which was independent of the contract, we readily conclude that Motorcity's claim falls well within the core of the economic loss rule. The basis of Motorcity's claim is that Southeast voluntarily assumed a duty to audit for the benefit of Motorcity. Thus, Motorcity seeks to impose on Southeast additional duties with respect to the financing arrangement. However, this is the precise subject about which the parties negotiated and concluded a contract; the contractual understandings allocated the risks among the parties. The core purpose of the economic loss rule is served by its application here. *Accord Strickland–Collins*, 545 So.2d

---

**25.** In the similar context of the fiduciary duty cases discussed above, the Florida law is also clear that such actions do not constitute a voluntary assumption of a duty. We believe the fiduciary duty cases also support our conclusion that no tort duty is assumed.

**26.** Economic loss includes "'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or dam-

age to other property.'" *Casa Clara Condominium Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244, 1246 (Fla.1993) (quoting Note, *Economic Loss in Products Liability Jurisprudence*, 66 Colum.L.Rev. 917, 918 (1966)). Motorcity cannot avoid the economic loss rule because of the nature of the damages it seeks. Motorcity is clearly seeking to recover for economic losses.

at 477–78 (finding similar action on the part of a lender not to be a separate or independent tort).

Motorcity also argues that Florida courts would allow recovery of its economic damages in tort, because "no alternative means of recovery" on the contract exists.[27] We conclude that the Florida courts would apply the economic loss rule in this case to bar Motorcity's negligence claim. In *Airport Rent–A–Car*, the Florida Supreme Court recently clarified and narrowed any operation of an exception for "no alternative recovery." 660 So.2d at 628. There, the plaintiff's contract claim, a breach of warranty claim, failed for lack of privity. Nevertheless, the court rejected the "no alternative recovery" theory and applied the economic loss rule to bar the plaintiff's negligence claim. The court acknowledged

> that the *Latite* [*Latite Roofing Co., Inc. v. Urbanek*, 528 So.2d 1381 (Fla.App. 4 Dist. 1988)] and *Moyer* [*A.R. Moyer, Inc. v. Graham*, 285 So.2d 397 (Fla.1973)] decisions sanctioned the "no alternative theory of recovery" exception; however, we disagree with … [plaintiffs'] assertion that it falls within the exception. As stated above, *Casa–Clara* [*Casa–Clara Condominium Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So.2d 1244 (Fla.1993)] specifically disapproved *Latite*, and limited *Moyer* to its facts.

*Id.* at 631. Just as the plaintiffs' contract claim in *Airport Rent–A–Car* was thwarted by a relevant legal principle (privity), so too was Motorcity's potential oral contract claim thwarted by a relevant legal principle, i.e., the *D'Oench* doctrine.

This case is like many Florida cases in which the economic loss rule has been applied. Motorcity and Southeast actually were the contracting parties; they negotiated a contract and consciously allocated duties and risks relating to the financing arrangement.[28] We conclude that the instant case falls well within the core purposes underlying the economic loss rule.

Indeed, the only Florida cases seemingly applying a "no alternative recovery" exception to the economic loss rule involve plaintiffs who were not parties to the underlying contract, and thus involve situations arguably lying outside of the core purposes of the economic loss rule. *See, e.g., First Fla. Bank v. Max Mitchell & Co.*, 558 So.2d 9 (Fla.1990) (accountant who negotiated loan on behalf of corporation and personally delivered audits of corporation to bank, with knowledge that bank would rely on statements in deciding whether to loan money to corporation, could be held liable for the bank's economic losses due to negligent preparation of the audits— despite lack of contractual privity between accountant and bank); *First American Title Ins. Co., Inc. v. First Title Serv. Co. of the Florida Keys, Inc.*, 457 So.2d 467, 472 (Fla. 1984) ("[W]hen an abstract is prepared in the knowledge or under conditions in which an abstracter should reasonably expect that the employer is to provide it to third persons for purposes of inducing those persons to rely on the abstract as evidence of title, the abstracter's contractual duty to perform the service skillfully and diligently runs to the benefit of such known third parties."); *A.R. Moyer, Inc. v. Graham*, 285 So.2d 397 (Fla.1973) (permitting general contractor to recover purely economic tort damages from an architect for negligent supervision of a project; the general contractor had no contract with the architect). These cases involve the creation of a kind of third party beneficiary status through negligence law "when an existing, specifically identifiable, intended beneficiary has not been given that status in the contract." *Sandarac Ass'n, Inc. v. W.R. Frizzell Architects*, 609 So.2d 1349, 1353 (Fla. App. 2 Dist.1992), *review denied*, 626 So.2d 207 (Fla.1993); *see also Airport Rent–A–Car*,

---

27. Were it not for the *D'Oench* doctrine, Motorcity might have a viable contract claim based upon alleged oral agreements and representations. Because of the *D'Oench* bar, however, Motorcity must base its claim against the FDIC upon the written terms of the floor plan financing agreement, or upon Southeast's conduct in auditing the dealership.

28. *See, e.g., Interstate Sec.*, 920 F.2d at 774–75; *AFM*, 515 So.2d at 180–81 (tort claim barred between contracting parties); *Florida Power*, 510 So.2d at 902 (same); *Strickland–Collins*, 545 So.2d at 477 (same).

660 So.2d at 630–31 & n. 4 (explaining that *First American* involved a third-party beneficiary cause of action rather than a negligence cause of action, and limiting *Moyer* strictly to its facts).

After the *Airport Rent–A–Car* clarification and narrowing of the "no alternative recovery" exception, it is not clear what the scope of the exception will be even for an intended third party beneficiary who is not a party to the contract and thus is unable to participate in the allocation of the contractual duties and risks. However, in this case we need not define the precise contours of the exception. Unlike an intended third party beneficiary of a contract, whose "status can be eliminated by language in a document over which the third party has no control," *Sandarac,* 609 So.2d at 1353, Motorcity was a party to the floor plan financing agreement, actually participated in the contract negotiations and allocation of risks, and thus falls within the core purposes underlying the economic loss rule. Accordingly, we believe that Florida's courts would apply the economic loss rule to prevent Motorcity from seeking tort remedies for the negligent performance of the audits.

## VI. CONCLUSION

In summary, we hold that the federal common law *D'Oench* doctrine has not been preempted, that Motorcity's attempt to escape the *D'Oench* bar by repaying its loan fails, that the free-standing tort exception to the *D'Oench* bar is not applicable, and thus that *D'Oench* bars any reliance by Motorcity on oral agreements and representations. Having thus stripped away all reliance on oral agreements, we conclude that Motorcity is left without a viable state law claim based either on fiduciary duty or negligence. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

BIRCH, Circuit Judge, concurring specially:

The majority's well-crafted and thorough analysis has persuaded me that the court has reached the correct result in this case—and for the right reasons. As the author of the original panel opinion in this case, my initial focus had been on the district court decision we were charged to review. In that opinion, there was no analysis done of the Florida law on negligence, the district court finding "that it need not determine what duty, if any, Florida law imposed on Southeast as a result of Southeast's exercising its right to conduct audits under the agreement. Such a duty would arise from Southeast's actions, not from the language of the written agreement." R2–52–6. It appeared to us, in reviewing the district court's grant of a motion to dismiss and in refusing to allow a party to amend its complaint, that Motorcity had adequately pleaded Florida tort claims. Based upon the law argued to us, at the pleading stage, we concluded that:

> These tort claims derive from Florida common law[9]; they do not depend upon any written or oral contract provision between Motorcity and Southeast. Indeed, Motorcity would appear capable of pleading the same two counts had the floor plan financing agreement never included any mention of audits.

\* \* \* \* \* \*

[9] *See Barnett Bank of West Florida v. Hooper,* 498 So.2d 923, 925 (Fla.1986) (holding that, under certain conditions, a bank assumes a duty to disclose facts material to a transaction); *Saglio v. Chrysler First Commercial Corp.,* 839 F.Supp. 830, 834 (M.D.Fla.1993) ("Although the law does not impose a duty upon [a lender] to reasonably perform inventory checks for [a guarantor's] benefit, liability for misfeasance can lie where a party voluntarily assumes a duty.").

*Motorcity of Jacksonville, Ltd. v. Southeast Bank N.A.,* 39 F.3d 292, 299 (11th Cir.1994). Based upon *In re Geri Zahn,* 25 F.3d 1539, 1543 (11th Cir.1994), and the cases cited therein, we concluded that Motorcity's negligent-auditing-and-disclosure tort claim was a "free standing tort," the prosecution of which was not barred by *D'Oench* or the statutory scheme. The majority's opinion presents an in-depth analysis of the Florida law of negligence, prefaced by the declaration "we must determine whether Motorcity can state a viable negligence claim based merely upon the fact that Southeast conducted the audit and sent summary reports thereof." Majority at

1341. After an exhaustive analysis, the following conclusion is reached:

> We conclude that the Florida case law would imply a tort duty only when actions are undertaken *for the benefit of another.* It would be inconsistent with well-established Florida law to infer a tort duty merely on account of actions undertaken pursuant to the protection of one's own interests.

Majority at 1342–43 (footnote omitted). Thus, the majority concludes that, under the facts as pleaded in this case, no viable independent tort claim exits under Florida law. Based upon the analysis of the pertinent law presented by the majority, I must agree. However, I do not read the majority's opinion to negate or question the continuing vitality of the "free standing tort" exception to the *D'Oench* doctrine. Accordingly, I conclude that a well-pleaded, viable state law tort claim may still be pursued without the bar of *D'Oench* or the applicable federal statute discussed in the opinion. The fact that the tort claim arose out of the banking relationship should not prevent its prosecution.